IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,

    Plaintiff,

v.

ERICK LOPEZ, *et al*.

    Defendants.

    /

No. CR 08-0730 WHA

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO EXCLUDE PROPOSED TESTIMONY OF DR. ANTONIO PUENTE**

**INTRODUCTION**

The main issue is the admissibility of defense mental health evidence in the wake of refusals by the subject defendant to answer questions posed by the government's rebuttal doctor. Specifically, the government now moves to exclude the testimony of defendant Erick Lopez's proposed mental condition expert witness Dr. Antonio Puente (Dkt. No. 3371). For the reasons stated herein, the government's motion is **GRANTED IN PART AND DENIED IN PART**. Dr. Puente will be permitted to testify to his conclusion that as of August/September 2005 defendant Lopez suffered from moderate organic brain syndrome, mild mental retardation, and mild depression. Dr. Puente may also testify to any clinically recognized consequences of these conditions, such as confusion, being easily influenced, difficulty making rational choices, etc. He will not, however, be allowed to testify that defendant Lopez in fact was confused, was easily influenced, or had difficulty making rational choices in August/September 2005 or any other conclusion that would be barred under Rule 704(b).

The jury will be instructed that it may use the opinion solely to evaluate whether defendant Lopez's joining the gang in August/September 2005 was a knowing and voluntary act but may not use the opinion to evaluate his intent in thereafter remaining in the gang or in committing any subsequent act found by the jury to have been committed by him. In parallel, counsel will be permitted to use the medical opinion in argument *only* for the authorized purpose and may not argue that the opinion explains why defendant Lopez stayed in the gang or why he did any alleged violent act.

**STATEMENT**

The issue has its roots in the early days in this case when certain defendants — including defendant Erick Lopez — were eligible for the death penalty. As the government was conducting its deliberations regarding whether it would seek the death penalty against defendant Lopez, defense counsel submitted a mitigation expert evaluation/report from neuropsychologist Dr. Antonio Puente. The report recounted Dr. Puente's review of an October 2003 psychological evaluation of defendant Lopez performed by the San Francisco Unified School District, his review of defendant Lopez's school records, his review of reports about defendant Lopez's parents, and his interviews with defendant Lopez's mother, former special education teacher, friend, and maternal grandmother. The report also described the results of a battery of tests and behavioral observations made of defendant Lopez during three days of testing by Dr. Puente. The tests included: (1) the Rey Test; (2) the Dot Counting Test; (3) the TOMM test; (4) the Spanish version of the Mini-Mental Status Exam; (5) the Cancellation Test; (6) semantic and fluency tests in both Spanish and English; (7) the Finger Tapping Test; (8) the Trail Making Test; (9) the Wisconsin Card Sorting Test; (10) the Hooper Visual Organization Test; (11) the Category Test; (12) the Stroop Color and Word Test; (13) the Digit Symbols Modalities Test; (14) the Benton Visual Retention Test; (15) the CNS Vital Signs Test; (16) the NEROPSI tests; (17) the Comprehensive Test of Non-Verbal Intelligence (CTONI); (18) the Wechsler Adult Intelligence Scale II Test; (19) the Peabody Picture Vocabulary Tests; (20) the Wood Munoz Language Survey; and (21) the Beck Depression Scale. The report ultimately concluded that defendant Lopez suffered from

2

moderate organic brain syndrome, mild mental retardation, and mild depression.

On September 16, 2010, the government filed notice that it would *not* seek the death penalty against any defendant (Dkt. No. 2273). On January 18, 2011, defendant Lopez filed notice of his intent to offer Dr. Puente's same mitigation opinions for both guilt and punishment purposes (Dkt. No. 3013). The notice specified that the testimony would be based on the same report by Dr. Puente earlier submitted to the government. A supplemental submission to the government on January 31 (but not then filed with the Court) further elaborated that Dr. Puente would testify as to how these mental conditions served to make defendant Lopez "easily manipulated and particularly susceptible to the influence of others who he perceives to be in positions of authority."

In response, the government filed an omnibus motion to preclude this (and other) proposed mental condition expert testimony. The motion was based on insufficient notice of Dr. Puente's proposed opinions (Dkt. No. 3371). In the alternative, the government moved for additional disclosures and a delayed opportunity to submit *Daubert* challenges after obtaining further disclosures. At the final pretrial conference, the request for additional disclosures was granted. The defense was ordered to submit supplemental disclosures and the government was given until February 28 to submit any motions to exclude based on these new disclosures (Dkt. No. 3522).

Defendant Lopez then submitted a supplemental expert disclosure. It reiterated that Dr. Puente would testify that defendant Lopez suffered from three mental conditions: moderate organic brain syndrome, mild mental retardation, and mild depression (Dkt. No. 3563). The disclosure summarized the bases for Dr. Puente's opinions — records reviewed by Dr. Puente and interviews conducted by Dr. Puente, as previously described in defendant Lopez's June 2010 submission to the government. The disclosure also reiterated the gamut of tests previously conducted by Dr. Puente. The government did not file a motion to exclude based on this supplemental disclosure.

On February 25, 2011, the government's mental condition rebuttal doctor — Dr. E. M. Suarez — examined defendant Lopez pursuant to court order (Dkt. No. 3355). The order

3

authorizing the examination provided a number of safeguards governing the examination, including: notice to defense counsel of the general scope of the evaluation and the specific tests to be conducted, defense counsel presence at a nearby location so he could consult with the defendant if necessary, and recording of the evaluation for defense counsel's later review. In order to protect defendant Lopez's Fifth Amendment right against self-incrimination, the order also specified that the government was prohibited from referencing at trial the compelled examination or statements made by defendant Lopez unless the defense first introduced expert testimony on mental condition at trial.[1] Furthermore, the order specified that the government examiner would not be permitted to rely on any portion of the examination that the undersigned later deemed to be improper. The order also specified that although questions regarding crime facts were not off-limits, "[t]his does not mean, however, that the examiner may inquire into crime facts unrelated to defendant [Lopez]'s mental condition."

One month after the completion of the examination, the government moved to exclude the testimony of Dr. Puente under FRCrP 12.2(d) due to defendant Lopez's refusal to answer six crime-fact questions. The unanswered questions sought information on:

- Whether defendant Lopez had ever bought a gun, had a gun loaned by a gang member, or had ever carried a gun;
- What gang was MS-13's biggest rival/enemy;
- Whether defendant Lopez had ever been aware of people in the gang collecting money for rent or for protection during the time he was in the gang;
- Whether defendant Lopez was aware of narcotic, drug, or marijuana sales and trafficking by the gang; and
- Whether defendant Lopez had tried to get out of the gang.

After a hearing on the issue, the government was ordered to submit a declaration identifying: (1) which questions defendant Lopez refused to answer; and (2) why any such refusal to answer frustrated Dr. Suarez's ability to offer his rebuttal opinion in full or in part

---

[1] The parties stipulated to almost all procedures governing the examination and the use of the examination's results (Dkt. Nos. 3174, 3224). The sole disagreements were limited to: (1) the proper scope of questioning regarding VICAR homicide "crime facts"; and (2) the scope of pre-examination notice of the tests the government examiner would implement. Although the stipulation was negotiated by counsel for defendant Jonathan Cruz-Ramirez, defendant Lopez joined in defendant Cruz-Ramirez's requests (Dkt. Nos. 2097, 3355).

4

(Dkt. No. 3843). In response, Dr. Suarez submitted a declaration identifying the six questions defendant Lopez refused to answer. The declaration, however, only offered a generalized conclusion that defendant Lopez's refusals made it impossible for Dr. Suarez to draw any conclusions or make any inferences regarding his mental condition (Dkt. No. 3956). As this declaration was insufficiently specific for the undersigned to determine whether a FRCrP 12.2(d) sanction was appropriate, Dr. Suarez was ordered to provide further detail to assist the undersigned in understanding why Dr. Suarez could not develop rebuttal testimony due to the refusals (Dkt. No. 4101).

In order to ensure that Dr. Suarez had an adequate picture of what his testimony would be rebutting, defendant Lopez's proposed witness — Dr. Puente — was ordered to also submit a declaration that specified his proposed testimony in more detail. Defendant Lopez accordingly submitted an additional declaration from Dr. Puente under seal. The declaration was substantively similar to the prior descriptions of Dr. Puente's testimony, but included one significant addition — his conclusion that defendant Lopez's "joining the gang was not a knowing and voluntary decision."

The government thereafter submitted a further declaration from Dr. Suarez. Again, he asserted he could not develop rebuttal opinion because of defendant Lopez's refusal to answer questions (Dkt. Nos. 4278). The government also submitted an accompanying memorandum. It raised Rule 403 and Rule 704(b) objections to Dr. Puente's most recent proffer (Dkt. No. 4288). The memorandum also raised a *Daubert* objection to Dr. Puente's testimony, but did not provide specificity as to why the proposed testimony violated *Daubert*. On June 8, counsel for defendant Lopez conceded that the portion of Dr. Puente's declaration asserting that defendant Lopez's "joining the gang was not a knowing and voluntary decision" should be stricken as a violation of Rule 704(b) (Tr. 9279).

Thereafter, the Court circulated a possible resolution and asked the parties whether they would agree to certain limitations to Dr. Puente's testimony and a corresponding instruction to the jury (as adopted by this order) (Dkt. No. 4435). Defendant Lopez asserted

5

that he had no objection to such limitations (Dkt. No. 4460). The government did not respond. Oral argument was again conducted on June 13.

## ANALYSIS

The government is entitled to present rebuttal to a defendant's mental-condition opinion testimony, and to this end, a defendant may be compelled to submit to an examination to the extent necessary. *See Buchanan v. Kentucky*, 483 U.S. 403, 422–423 (1987); FRCrP 12.2(c). FRCrP 12.2(d) authorizes the exclusion of a defendant's proposed mental-condition evidence if the defendant refuses to submit to a court-ordered examination, thereby sabotaging the government's ability to offer rebuttal testimony. The immediate issue is thus whether defendant Erick Lopez's refusal to answer certain crime-fact questions now warrants the complete or partial exclusion of Dr. Puente's proposed expert testimony. In order to deflect this problem, defense counsel has now narrowed the purpose and relevance of his proffer to defendant Lopez's mental condition as of August/September 2005 (the date he joined the gang).[2]

Use by the jury of Dr. Puente's opinion, therefore, will be limited to the specific purpose recently designated by defense counsel — to defendant Lopez's mental condition in August/September 2005. Put differently, in order to justify the refusal to answer subsequent crime-fact questions, defense counsel scaled back the relevance of the proffer to an earlier time frame, namely, the time in 2005 when defendant Lopez joined the gang. Given this narrowed relevance, there is substantially less need for the government's examiner to interview defendant Lopez as to crime facts after he joined the gang in 2005 and even why he remained in the gang.

Dr. Puente may accordingly testify to his: (i) qualifications; (ii) the examination conducted by him (subject, however, to Rule 703 and its bar of alluding to hearsay without advance approval); (iii) his conclusion that defendant had depression, moderate organic brain

---

[2] In determining what sanctions, if any, should be imposed, the advisory committee notes to the 2002 amendments to FRCrP 12.2(d) advise that "the effectiveness of less severe sanctions, the impact of preclusion on the evidence at trial and the outcome of the case, the extent of prosecutorial surprise or prejudice, and whether the violation was willful" should be considered.

6

syndrome, and mild mental retardation in August/September 2005; and (iv) the generic textbook symptoms recognized for these mental conditions. Dr. Puente may *not* testify that in August/September 2005 defendant Lopez in fact was confused, easily manipulated, or suffered from any specific other symptoms associated with the three conditions. To do so would violate Rule 704(b).

Once the jury is informed of the diagnosis and the generic symptoms, it will not need expert opinion to apply those symptoms to the overall factual record to make its own findings concerning the reasons why defendant Lopez joined the gang, such extrapolation being within the ken of reasonable jurors. And, allowing further opinions as to the extent to which any generic symptoms — such as being easily influenced — in fact led defendant Lopez to join the gang would mire the trial in a mish-mash of speculation by hired experts, create confusion, and prove little beyond what the jury can synthesize on its own once informed of the basic diagnosis and textbook symptoms. Under Rule 403, this should be and will be excluded.

The cross-examination will be likewise cabined. There will be no need for government counsel to cross-examine to show that defendant Lopez refused to answer questions directed to the time period after August/September 2005, given the limited purpose for which the testimony is offered. Questions pertaining to the generic symptoms must be framed in generic terms, such as, "In assessing the extent of susceptibility to influence of someone suffering from organic brain syndrome, would it be relevant to know the extent to which the subject had the benefit of parental guidance?"

To implement this limited purpose, the jury will be instructed that Dr. Puente's testimony can only be considered to evaluate defendant Lopez's mental state in August/September 2005 and may not be used to explain why he remained in the gang or committed subsequent acts. This also means that the medical testimony may not be used by counsel in argument to explain why defendant Lopez remained in the gang for years thereafter or to explain why defendant Lopez committed any subsequent violent act or other crime.

This order recognizes that allowing this testimony, even in its limited form, is somewhat unfair to the government because the unanswered questions were fair game at the time of the examination, *before* counsel narrowed the scope of the proposed testimony. The government, however, has failed to supply a convincing record that defendant Lopez's refusal to answer the six questions has or will frustrate Dr. Suarez's ability to develop rebuttal for the limited purpose defendant Lopez now offers the expert testimony. Defendant Lopez did not refuse to answer *all* crime-fact questions posed by Dr. Suarez — and he answered all crime-fact questions regarding his joining of the gang. This comports with the prior order authorizing the examination, which made clear that the examination's inquiry into crime facts would be limited to those related to the mental conditions at issue (Dkt. No. 3355). Given defendant Lopez's scaling back of his proposed testimony, complete exclusion of Dr. Puente's testimony would be a disproportionate sanction, or so our court of appeals might hold.

Defendant Lopez's re-focusing of Dr. Puente's testimony to the August/September 2005 time period also changes the Rule 403 calculus. Defendant Lopez has made a sufficient if minimal showing that the limited testimony may have probative value as to defendant Lopez's mental condition when he joined the gang. *See United States v. Sandoval-Mendoza*, 472 F.3d 645, 655 (9th Cir. 2006); *United States v. Childress*, 58 F.3d 693, 728–29 (D.C. Cir. 1995). With the aforementioned limitations in place, the probative value of Dr. Puente's testimony will outweigh, if barely, any danger of prejudice or confusion of issues. In light of the foregoing limitations, the government's Rule 403 objections are overruled.

No hearing outside the presence of the jury to address the government's *Daubert* objections is necessary. The government was already given an extension — to February 28 — to submit any objections to Dr. Puente's proposed testimony (Dkt. No. 3522). No *Daubert* objections were submitted by that time and the government has no convincing basis for the tardiness of its *Daubert* challenge.[3] In any event, a trial court need not make a reliability determination prior to the proposed witness' testimony at trial to satisfy its *Daubert*

---

[3] The only "new" opinion offered after the government's extended deadline for *Daubert* motions was Dr. Puente's assertion that defendant Lopez's decision to join the gang was not voluntary. Counsel has asserted that Dr. Puente will not assert this opinion and this order excluded the opinion as a violation of Rule 704(b).

8

gatekeeping duty. *See United States v. Alatorre*, 222 F.3d 1098, 1102 (9th Cir. 2000). As was the procedure for the firearms experts, the reliability of Dr. Puente's specific methods will be taken up during *voir dire* in the presence of the jury. If the government can sufficiently undermine the reliability of Dr. Puente's testimony, the jury will be told to disregard Dr. Puente's testimony. The proposed testimony is not so inflammatory that a jury would not be able to disregard it if so instructed.

Finally, although not yet directly teed up, this order cautions that a further issue seems likely, namely the extent to which Dr. Puente may attempt to place otherwise inadmissible hearsay before the jury in the guise of explaining the basis of his diagnosis. Rule 703 states that: "facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs the prejudicial effect." Until advance approval is given, defense counsel shall not elicit or refer to otherwise inadmissible hearsay from Dr. Puente. Dr. Puente can state his diagnosis without getting into the hearsay basis for it. Of course, on cross-examination, government counsel possibly may ask questions that open the door for the witness to reference the basis for his opinions, in which case the witness will likely be allowed to state the hearsay basis for his opinions. In this regard, government counsel may wish to proceed with caution.

## CONCLUSION

Subject to the foregoing limitations, Dr. Puente will be permitted to testify.

**IT IS SO ORDERED.**

Dated: June 17, 2011.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

9