1  PETER GOODMAN, ESQ.
   State Bar No. 65975
2  400 Montgomery Street, Second Floor
   San Francisco, California  94104
3  Telephone: (4l5) 781-8866
   Facsimile:   (415) 781-2266
4
   Attorney for Defendant
5  ERICK DAVID LOPEZ

6

7                    UNITED STATES DISTRICT COURT

8                  NORTHERN DISTRICT OF CALIFORNIA

9                     SAN FRANCISCO DIVISION

10

11  UNITED STATES OF AMERICA,          )   CR-08-0730 WHA
                                       )
12           Plaintiff,                )   SENTENCING MEMORANDUM OF
                                       )   DEFENDANT ERICK LOPEZ AND
13       vs.                           )   MOTION FOR DOWNWARD
                                       )   DEPARTURE AND/OR *BOOKER*
14  ERICK DAVID LOPEZ, et al.,         )   VARIANCE
                                       )   DATE:     November 30, 2011
15           Defendants.               )   TIME:     8:00 a.m.
                                       )   COURT:    15
16                                     )
                                       )
17  _____ )

18                          INTRODUCTION

19       Defendant ERICK DAVID LOPEZ hereby submits the following Sentencing

20  Memorandum in support of his request for a downward departure and/or *Booker*

21  variance relative to those counts of conviction that do not carry a mandatory sentence

22  set by statute.  As to Counts One, Two and Three, defendant LOPEZ concurs with the

23  Sentencing Recommendation in the Presentence Report ("PSR") that respective terms

24  of 20 years, 10 years and 3 years be imposed as to those three counts to run concurrent

25  with the mandatory life terms imposed as to Counts Five and Six.  As to Counts Seven

26  and Eight, defendant LOPEZ requests that the Court impose a 10 year term to run

27  concurrent with the life terms imposed as to Count Five and Six.  As to Count Nine,

28  defendant LOPEZ requests that the Court impose a 25 year term rather than the

consecutive life term recommended in the PSR.  Defendant LOPEZ submits that the

downward departures and/or *Booker* variances incorporated into the sentences which

he is requesting are consistent with the policies set forth in the Sentencing Guidelines

and will result in sentences "sufficient but not greater than necessary" to accomplish

the goals set forth in 18 U.S.C. §3553.  *Kimbrough v. United States*, 552 U.S. 85, 101

(2007).  The two life terms as to Counts Seven, Eight and Nine recommended in the

PSR by United States Probation Officer ("USPO") Tam, with the latter to run consecutive

to the life terms imposed as to Counts Five and Six, is not consistent with the teachings

of *Kimbrough* and would serve to nullify the requirement recognized by the Supreme

Court  in *Booker, Gall v. United States*, 552 U.S. 38 (2007) and most recently, in *Pepper*

*v. United States*, ___ U.S. ____, 131 S. Ct. 1229 (2011), that in imposing an appropriate

sentence, the court "consider every convicted person as an individual and every case as

a unique study in the human failings that sometimes mitigate, sometimes magnify, the

crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

Fair and just consideration of the personal history and characteristics of Erick Lopez

support the sentences he has requested herein.

THE OFFENSE CONDUCT

The case against Erick Lopez is essentially driven by the murders of Phillip Ng

and Ernad Joldic during the early morning hours of March 29, 2008.   While Mr. Lopez

was found guilty of participating in the RICO enterprise and the two other conspiracies

alleged in Counts One, Two and Three of the Third Superseding Indictment, the PSR

recognizes that his role in the 20th Street clique of MS-13 was that of a member and not

a organizer, leader, manager or supervisor within the meaning of §3B1.1 of the United

States Sentencing Guidelines ("USSG").   (PSR ¶64.)   And once he was arrested on

March 30, 2008, for possessing the .45 caliber handgun linked to those murders, his

participation on any meaningful level in the activities and affairs of the 20th Street clique

ended.   The murders of Juan Rodriguez, on May 31, 2008, Armando Estrada on July

11, 2008, and Ivan Miranda on July 31, 2008, were committed well after Mr. Lopez was

1   incarcerated and no evidence was adduced at trial that he had any advance knowledge

2   that those murders were planned by the 20th Street clique or were likely to occur.  These

3   three spontaneous acts of violence are inconsistent with the claim USPO Tam makes

4   in the PSR that they were reasonably foreseeable to Mr. Lopez, sitting in his jail cell in

5   Alameda County, because they were committed in furtherance of "jointly undertaken

6   criminal activity" and should be considered "relevant conduct" under USSG §1B1.3 in

7   calculating the sentence to be imposed on Mr. Lopez.  (PSR ¶68).   Application Note 2

8   to USSG §1B1.3 ("relevant conduct is not the same for every defendant") and well

9   established Ninth Circuit case law do not support that result.

10          In *United States v. Whitecotton*, 142 F.3d 1194 (9th Cir. 1998), in the context of

11   a drug conspiracy, the Ninth Circuit found that the limitations on accountability for the

12   conduct of others imposed by USSG  §1B1.3(a)(1)(B) foreclosed holding the defendant

13   liable for drug sales in which he did not participate.

> Without a share of the money, knowledge, presence, acts in
> participation, or anything else but a historical social connection,
> there was no basis for concluding that the subsequent sales by
> Lineberry were "jointly undertaken" by Whitecotton. *Whitecotton,
> supra,* 142 F.3d at 1199.

17   Here, concluding that the murders of Juan Rodriguez, Armando Estrada and Ivan

18   Miranda should be considered relevant conduct in calculating the sentence to be

19   imposed on Mr. Lopez in the absence of evidence showing his knowledge, presence

20   or personal participation in the illegal conduct is similarly unsupportable under USSG

21   §1B1.3(a)(1)(B).

<u>THE CRIMINAL HISTORY OF ERICK LOPEZ</u>

23          The PSR notes that Mr. Lopez has no juvenile adjudications.  (PSR ¶139.)

24   Prior to his arrest in this case, his only adult conviction occurred on September 20,

25   2006, when he was convicted of misdemeanor vandalism growing out of an arrest

26   for felony grand theft.  (PSR ¶140.)   That conviction resulted in the assignment of

27   one criminal history point to Mr. Lopez, "establishing a Criminal History Category I."

28   (PSR ¶142.)

1    Walter Palma testified that both he and Mr. Lopez were "jumped in" to the 20th

2   Street clique in September of 2005.  The PSR places the date as "in or around 2005."

3   (PSR ¶59.)   By his own testimony, Mr. Palma was invited to become a member owing

4   to his reputation for engaging in wanton acts of violence.  During the ensuing years, he

5   more than lived up to that reputation.  It is unclear why a similar invitation was extended

6   to Mr. Lopez.  Regardless of its cause, his agreement to join did not generate the serial

7   offenses against persons and property so common to the other young men who threw

8   in their lot with the 20th Street clique.  While Sergeant Mario Molina and other members

9   of the San Francisco Police Department undoubtedly had occasion to detain Mr. Lopez

10   in the vicinity of Mission Playground on numerous occasions during the two plus years

11   of his membership, only two of those detentions ripened into an arrest.

12    One was for the grand theft charge that resulted in his only adult conviction for

13   vandalism.  The other, earlier in time, was for a double shooting in front of the Golden

14   Eagle Market on January 8, 2006, when Mr. Lopez was arrested with Carlos "Tweety"

15   Garrido.  The government went to great lengths at trial to establish that Mr. Lopez was

16   responsible for that shooting, apparently recognizing that the absence of any violence

17   in his record would make it difficult to believe he was responsible for the double murder

18   with which he was charged.  The government attempted to make its case through the

19   testimony of Mr. Garrido, who had decided to cooperate and then admitted possessing

20   the handgun used in the shooting, running from the police with the gun in his possession

21   and pretending to being asleep when he was discovered by the police hiding behind a

22   wall.  That attempt, like a similar attempt to prove Mr. Lopez was responsible for a late

23   disclosed stabbing on February 20, 2008, through the testimony of another cooperator,

24   Jose "Chiqui" Espinal, was unconvincing.

25    The criminal histories and testimonial admissions of government cooperators at

26   trial establish that while Mr. Lopez may have been "jumped in" to the 20th Street clique in

27   September of 2005, proof of his involvement in acts of violence before the evening of

28   March 29, 2008, lacked convincing evidentiary support.

1    <u>THE HISTORY AND CHARACTERISTICS OF ERICK LOPEZ</u>

2    In attempting to understand how someone who played such a limited role in the

3    affairs of the 20th Street clique could find himself before this Court facing life in federal

4    prison, it is necessary to begin at the beginning, with those who knew Mr. Lopez from

5    the time of his birth.  One such person is Adelmira Lopez Orellana, the defendant's

6    grandmother.  While Mrs. Orellana testified at trial, the scope of her testimony was

7    truncated by evidentiary limitations which do not apply here.  Attached hereto as Exhibit

8    A and incorporated by this reference is an interview with Mrs. Orellana conducted by a

9    defense investigator.

10    The PSR discusses the birth of Mr. Lopez in Guatemala City, Guatemala, on

11    July 2, 1988, and contains an outline of his early childhood in that country.  (PSR ¶147.)

12    However, the interview with Mrs. Orellana contains significant additional information

13    discussing the history of mental disabilities in the Lopez family.  It also fleshes out

14    details concerning the circumstances of Mr. Lopez's birth and his early development.

15    (Orellana Interview, pp. 1-3.)  Of particular importance is her description of the close

16    relationship that developed between Mr. Lopez and his great-grandmother, Soyla Elisa

17    Lopez, with whom he formed an extraordinarily close bond after his mother departed

18    Guatemala with David Padilla when Mr. Lopez was still a small child.   The death of his

19    great-grandmother in October of 1998 was devastating to Mr. Lopez, who completely

20    withdrew and appears to have suffered a profound change in personality as a result.

21    (Orellana Interview, pp. 4-5.)  Coupled with the cognitive and adaptive behavior deficits

22    Mrs. Orellana describes (his learning disabilities, his inability to dress himself or even tie

23    his shoes and his problems interacting with children his own age), it is not surprising that

24    when Mr. Lopez was taken to the United States by his mother in 1998 after the death of

25    the great-grandmother, he experienced enormous personal difficulties adjusting to his

26    new life.  In terms of the mental conditions that were subsequently diagnosed in Mr.

27    Lopez, Mrs. Orellana's description of him during her visits to the United States as

28    withdrawn, naive, gullible and childlike are particularly relevant. (Orellana Interview, pp.

5-7.)

The personal difficulties Mr. Lopez experienced in adjusting to his new life in this country are brought into graphic focus by the interview with Angelica Granados, who first encountered Mr. Lopez in her English as a Second Language class at Everett Middle School. A copy of the interview with Ms. Granados is attached hereto as Exhibit B and incorporated by this reference. Ms. Granados remembers his difficulties trying to keep up with the other students in the class and the fact that he needed more one-to-one help from the teacher. (Granados Interview, p. 2.) She describes her initial impression of Mr. Lopez as quiet and looking sad. (Granados Interview, p. 2.) She also describes in disturbing detail the teasing and bullying Mr. Lopez experienced at the hands of other students and the failure to campus security guards to intervene.

> Granados said that everyone laughed at Erick — girls, boys, Latinos, blacks, everyone. They laughed at the way he walked, the way he talked and because he was too shy to have a girlfriend. They called him "gay." Granados said that Erick walked slowly, with his head down. He would never look you in the eyes because his head was always down. (Granados Interview, p. 2.)

Granados describes Mr. Lopez as eventually fighting back and in the process becoming friendly with another defendant in this case, Moris Flores, who had also been picked on by other students. (Granados Interview, p. 3.) Granados then states:

> Even after Erick changed, Granados said that he had such a weak mind that people used to get him to do things. They'd tell him to go hit someone or to threaten to jump someone and Erick would do it. He was very easy to convince. Granados said that was why a lot of people were around Erick ---- because he'd do whatever they told him to. (Granados Interview, p. 3.)

While attending Everett Middle School, Mr. Lopez was assessed by a school psychologist and found to be suffering from a variety of behaviors that were consistent with a diagnosis of emotional disturbance. (PSR ¶157.) He was referred to counseling and found eligible for Special Education Services. The only positive school experience Mr. Lopez appears to have had began in the Fall of 2004 when he attended George Washington High School and was placed in a Special Education class taught by Sam

1  Janeway.  A copy of an interview with Mr. Janeway is attached hereto as Exhibit C.  Mr.

2  Janeway  describes Mr. Lopez as quiet and "never challenging or threatening to anyone

3  at school . . . more of a follower and he would be perceived as being weak — exactly the

4  type of kid that could easily be recruited by a gang." (Janeway Interview, p. 3.)  Mr.

5  Lopez's transcripts reflect that during the Fall semester of 2004 and the Spring semester

6  of 2005, his grades improved significantly in Mr. Janeway's class.  However, during the

7  Fall semester of 2005, when he was recruited into the 20th Street clique, his grades

8  plummeted.  Mr. Janeway describes trying to dissuade Mr. Lopez  from going in the

9  direction of the gangs and that he would listen and nod "but Erick was a follower."

10  (Janeway Interview, p. 4.)  He describes Mr. Lopez during his second year as "fading

11  away" until he finally stopped attending class altogether.   (Janeway Interview, p. 4.)

12         During the trial, Antonio Puente, Ph.D., testified about the lengthy evaluation he

13  conducted of Mr. Lopez in June of 2010, and the written report he prepared which found

14  that at the time he was "jumped in" to the 20th Street clique in September of 2005, Mr.

15  Lopez was suffering from three mental conditions: organic brain syndrome  (moderate);

16  mental retardation (mild); and depression (mild).[1]   These conditions are consistent

17  with the adaptive behavior deficits described by Mrs. Orellana from the time of his early

18  childhood, the learning disabilities he encountered in school and his inability to form long

19  term, meaningful relationships with his peers.  It is this history and these characteristics

20  that warrant a downward departure and/or *Booker* variance in this case.

I.

**A DOWNWARD DEPARTURE AND/OR *BOOKER* VARIANCE
IS WARRANTED BY THE UNIQUE COMBINATION OF FACTORS
THAT HAVE BROUGHT ERICK LOPEZ BEFORE THIS COURT**

24         Even before the Supreme Court issued its decision in *Pepper v. United States,*

25  *supra,* the Ninth Circuit had cited with approval language from a Sixth Circuit opinion

26  noting that *Booker* and its progeny have served to "breath life into the authority of district

28  [1]  A copy of Dr. Puente's written report has previously been lodged with this Court and has been provided to both the government and USPO Tam.

1  court judges to engage in individualized sentencing." *United States v. Vonner*, 516 F.3d

2  382, 392 (6th Cir. 2008) (en banc) (Sutton, J.), as quoted in *United States v. Whitehead,*

3  532 F.3d 991, 993 (9th Cir. 2008).  In fashioning the individualized sentence required in

4  this case, Mr. Lopez asks the Court to consider the following factors which he believes

5  warrant the requested downward departures and/or *Booker* variances.

6        First, the Court should reject the suggestion in the PSR that the Rodriguez,

7  Estrada and Miranda homicides should be considered as relevant conduct in arriving

8  at an appropriate sentence for Mr. Lopez.  There is no evidentiary support in the record

9  that subsequent to his arrest and incarceration, Mr. Lopez had any advance knowledge

10 those crimes were planned by the 20th Street clique, were likely to occur or reasonably

11 foreseeable to him.  The teachings of *United States v. Whitecotton*, *supra*, 142 F.3d at

12 1199, foreclose a finding that these homicides can be counted as relevant conduct as to

13 Mr. Lopez.

14        Second, the Court should consider the limited role Mr. Lopez played in the 20th

15 Street clique prior to the events of March 29, 2008.  As is clear from his minimal criminal

16 history and the lack of any convincing testimony during trial concerning his commission

17 of any crimes of violence before that date, from childhood on Mr. Lopez was gullible and

18 easily led, someone who could be convinced to do the bidding of others.  There are

19 compelling inferences from the trial record that is precisely what occurred during the

20 early morning hours of March 29, 2008.

21        Finally, in arriving at an appropriate sentence, this Court is required to consider

22 the Policy Statements set forth in the Sentencing Guidelines, even though they are no

23 longer binding. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  There are two

24 policy statements of particular relevance here.  USSG §§5H1.3 provides in pertinent

25 part:

26              Mental and emotional conditions may be relevant in determining
               whether a departure is warranted, if such conditions, individually
27              or in combination with other offender characteristics, are present
               to an unusual degree and distinguish the case from the typical
28              cases covered by the guidelines.

Similarly, USSG §5K2.13 provides in pertinent part:

> A downward departure may be warranted if 1) the defendant committed the offense while suffering from a significantly reduced mental capacity; 2) the significantly reduced mental capacity contributed substantially to the commission of the offense.  Similarly, if a departure is warranted under this policy statement, the extent of the departure should reflect the extent to which the reduced mental capacity contributed to the commission of the offense.

Here, from early childhood well into his adult life, Mr. Lopez exhibited behavioral deficits consistent with mild mental retardation.  Those deficits are described in detail in the interviews conducted with Adelmira Orellana, Angelica Granados and Sam Janeway.  There are confirmed by the empirical testing conducted by a psychologist from the San Francisco Unified School District in 2003 and the validated testing conducted by Dr. Antonio Puente in 2010.   Those deficits have endured unabated throughout the life of Mr. Lopez and must necessarily have played a role in the events of March 290, 2008.  For this reason, they warrant the downward departures and/or *Booker* variances that Mr. Lopez is seeking.

## II.

### THE COURT SHOULD NOT IMPOSE A CONSECUTIVE SENTENCE OF LIFE IMPRISONMENT ON COUNT NINE

As a result of the convictions he has suffered on Counts Five and Six, Mr. Lopez is facing mandatory sentences of life imprisonment as to those counts.  As a result of the convictions he suffered on Counts Seven, Eight and Nine, Mr. Lopez is facing a 25 year consecutive sentence for possessing the handgun used in the Ng/Joldic homicides. In his Sentencing Recommendation, USPO Tam appears to recognize that Mr. Lopez has "a lowered ability to function intellectually" and "does not have a significant record of prior criminal conduct."  (Sentencing Recommendation, p. 2.)   Nonetheless, USPO Tam recommends that this court impose two life sentences on the gun possession counts, the first sentence as to Counts Seven and Eight to run concurrent with the life

1    sentences to be imposed on Counts Five and Six.  He then recommends that the life

2    sentence on Count Nine run consecutive to the life sentences on Counts Five and Six.

3    The justification for this recommendation is not entirely clear but appears to be based

4    on "the heinous nature of the crime committed and the impact on the victims' families."

5    (Sentencing Recommendation, p. 3.)

6        The deaths of Phillip Ng and Ernad Joldic are senseless tragedies that warrant

7    severe punishment.  Erick Lopez stands convicted of those murders and by statute will

8    receive the most severe punishment short of death he can receive under federal law.

9    He will spend the rest of his life in federal prison.   If any additional punishment was

10   necessary, it is provided by the consecutive 25 year sentence that will be imposed for

11   using a handgun in the commission of those murders.   Imposing a consecutive life

12   sentence on Count Nine is both unnecessary and inconsistent with USSG §5G1.2(c)

13   since the sentences for Counts Five and Six alone are more than adequate "to achieve

14   the total punishment."   While Mr. Lopez recognizes that this Court has discretion to

15   depart upward and impose a consecutive life sentence as to Count Nine, he believes

16   that the statutory penalties to be imposed are more than adequate within the meaning

17   of  18 U.S.C. §3553(a)(2)  to reflect the seriousness of his offenses, promote respect

18   for the law, provide just punishment, afford adequate deterrence and protect the public

19   from his commission of further offenses.  Mr. Lopez asks the Court to impose a 25 year

20   sentence rather than a consecutive life sentence as to Count Nine.

21                              CONCLUSION

22       For the foregoing reasons, defendant LOPEZ requests that as to Counts One,

23   Two and Three, the Court impose terms of 20 years, 10 years and 3 years to run

24   concurrent with the mandatory life terms imposed as to Count Five and Six.  As to

25   Counts Seven and Eight, defendant LOPEZ requests that the Court impose a 10 year

26   term to run concurrent with the life terms imposed as to Counts Five and Six.  As to

27   Count Nine, defendant LOPEZ requests that the Court impose a 25 year term rather

28   than the consecutive life term recommended by USPO Tam.  Defendant LOPEZ submits

1   that the downward departures and/or *Booker* variances incorporated into the sentences

2   which he is requesting are consistent with the policies set forth in the Sentencing

3   Guidelines, the need for sentences "sufficient but not greater than necessary" and

4   the requirement of individualized sentencing discussed most recently in  *Pepper v.*

5   *United States*, ___ U.S. ____, 131 S. Ct. 1229 (2011)

6   DATED:   November 28, 2011

7

8

                                                    /s/
9                                          PETER GOODMAN
                                           Attorney for Defendant
10                                         ERICK DAVID LOPEZ

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28